UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| STEPHEN A. PISKOR, | ) | CASE NO. 1:18CV1885 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| | ) | Magistrate Judge George J. Limbert |
| v. | ) | |
| | ) | |
| ANDREW M. SAUL[1], | ) | |
| COMMISSIONER OF SOCIAL | ) | REPORT AND RECOMMENDATION |
| SECURITY ADMINISTRATION, | ) | OF MAGISTRATE JUDGE |
| | ) | |
| Defendant. | ) | |

This matter is before the undersigned on Plaintiff Stephen Piskor's ("Plaintiff"), pro se, request for judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") adjudicating Plaintiff liable for repayment of $7,859.61 during the period of April 1, 2013 to March 1, 2016 due to excess resources. ECF Dkt. #1. In his brief on the merits, filed March 29, 2019, Plaintiff requested a judgment: (1) to find that he is not liable for repayment because the Social Security Administration ("SSA") was not justified in reducing or stopping his SSI payments; and (2) to restart his SSI benefits and receive back pay from the period beginning January 1, 2018 to the present. *See* ECF Dkt. #15. On April 29, 2019, Defendant filed a brief on the merits. ECF Dkt. #16. On May 7, 2019, Plaintiff filed a reply brief. ECF Dkt. #17.

For the following reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and DISMISS Plaintiff's complaint in its entirety WITH PREJUDICE.

---

[1]On June 17, 2019, Andrew M. Saul became the Commissioner of Social Security, replacing acting Commissioner Nancy A. Berryhill.

### I. FACTUAL AND PROCEDURAL HISTORY

Plaintiff began receiving SSI on May 1, 1995.[2] ECF Dkt. #11 ("Tr.")[3] at 15. The record before the undersigned reveals three sources of income that led the SSA to determine that they had overpaid SSI to Plaintiff: royalties from a self-published book, a large settlement, and benefits received by living with his brother. ECF Dkt. #16 at 10-14; ECF Dkt. #16-2 at 1.

#### A. ROYALTIES

Plaintiff self-published a book about his family genealogy, entitled *Gypsy Violins: Hungarian Slovak Gypsies in America*, around 2011 or 2012. ECF Dkt. #15 at 2; ECF Dkt. #16 at 1; Tr. at 16-17. Plaintiff stated that he had been researching and documenting his family history for over 50 years and the book was his life's work. ECF Dkt. #15 at 1-4. Plaintiff received royalties in the total amount of $972.94 for the period between October 2012 and November 2015. ECF Dkt. #16 at 1; ECF Dkt. #15 at 2; Tr. at 50-52.

SSA determined that the royalty payments were to be treated as earned income. Tr. at 55. On December 15, 2015, SSA sent Plaintiff a Notice of Planned Action, stating that SSA would lower his monthly SSI payments by $88.00, from $733.00 to $645.00, beginning January 2016 due to his increased income from royalty payments as well as the food or shelter he received by living with his brother Russell, discussed more in depth below. ECF Dkt. #16-1 at 1-2. On January 13, 2016, SSA sent Plaintiff a Notice of Overpayment, stating that SSA overpaid him $588.61 of SSI from April

---

[2] Neither Plaintiff's medical condition nor his ability to meet the medical criteria for SSI are at issue in this case. Consequently, the undersigned will focus its analysis on Plaintiff's income and resources and whether SSA overpaid Plaintiff.

[3] All citations to the transcript refer to the page numbers assigned when the transcript was filed in the CM/ECF system rather than the page numbers assigned when the transcript was compiled. This allows the Court and the parties to easily reference the transcript as the page numbers of the .PDF file containing the transcript correspond to the page numbers assigned when the transcript was filed in the CM/ECF system.

2013 through December 2015 due to his wages and the food or shelter he received by living with his brother. ECF Dkt. #16-2 at 1. Plaintiff either could have paid the $588.61 sum by February 12, 2016 or SSA would withhold $73.30 each month starting April 2016 until the debt was paid back. *Id.* at 3-4; Tr. at 148. The $73.30 amount the SSA would withhold would not amount to more than 10% of Plaintiff's total income, which is the most SSA could hold back without consent. ECF Dkt. #16-2 at 3.

### B. SETTLEMENT

In 2009, Plaintiff was appointed the guardian of his mother, Esther Piskor, and her estate on the grounds that she was incompetent and required nursing care. ECF Dkt. #16 at 2; *see* Tr. at 56 (referring to Plaintiff as "Guardian of his mother"); 276-77, 281 (Plaintiff testified at the hearing before the ALJ that he was his mother's guardian.). In 2011, Plaintiff began investigating the nursing home where his mother resided by placing hidden cameras in her room. He discovered eight nursing aids were physically abusing his mother, which led to the firing and criminal conviction of some members of the nursing staff. ECF Dkt. #16 at 2; ECF Dkt #17 at 4; Tr. at 100.

In 2013, Plaintiff filed a personal injury lawsuit on his mother's behalf against the quasi-governmental agency in charge of the nursing home where she was abused. ECF Dkt. #16 at 2. The case resulted in a substantial settlement of $1,000,000, which the court approved on March 31, 2015. *Id.*; Tr. at 58-67. The settlement was divided so that Plaintiff's share consisted of $100,000.00 "for extraordinary guardian services rendered." Tr. at 58.[4] Plaintiff received his share of the settlement

---

[4] The undersigned notes that the settlement also ordered the net amount of $356,991.40 for the benefit of the Ward, Esther Piskor, to be delivered to the guardian of her estate, Plaintiff, but which was conditioned upon Plaintiff giving an additional $640,000.00 bond to be filed within 30 days of March 31, 2015. Tr. at 58. Defendant's brief stated that on March 15, 2016, the court instead allowed Plaintiff to place the guardianship assets into a bank account requiring a court order for their release. ECF Dkt. #16 at 2 n.4 (citing to information outside the record that is available to the undersigned); *see also* tr. at 101. However, since only

3

in four separate installments conditioned upon Plaintiff keeping the matter confidential. ECF Dkt. #16 at 3; Tr. at 62-65; 100. The first payment of $25,000 was made in March 2015, the second payment of $10,000 was made in December 2015, the third payment of $10,000 was made in March 2016, the fourth payment of $15,000 was made in June 2016, the fifth payment of $20,000 was made in December 2016, and the final payment of $20,000 was made in March 2017. Tr. at 65-66, 100; ECF Dkt. #15 at 7.

In May 2015, Plaintiff sought to establish a special needs trust on his behalf in order for him to remain eligible to receive SSI. ECF Dkt. #16 at 3; Tr. at 56, 100-01. Plaintiff's attorneys advised him that "it would be best to deposit the money in the Attorney Trust Account until litigation for a special needs trust is approved." ECF Dkt. #15 at 5; *see also* ECF Dkt. #1 at 4. Plaintiff testified before an ALJ that the purpose of spending down part of his funds and depositing a portion in his attorney's trust account was an effort to protect his Social Security benefits. Tr. at 285-86.

In November 2015, a magistrate judge found that the Probate Court lacked authority to set up such a trust and denied Plaintiff's request. ECF Dkt. #16 at 3; Tr. at 56-57, 100-01. The magistrate suggested that Plaintiff could have a conservator appointed for the limited purpose of establishing a special needs trust on his behalf and urged him to do so. ECF Dkt. #16 at 3; Tr. at 56; ECF Dkt. #17 at 1-2. Plaintiff further noted that:

> The trust fund [the magistrate judge] said she would approve was very strict and I would have had to go to her every time I wanted something. It took her months to deny everything and I'm now supposed to go back to her for my money. The attorneys recommended against it, they filed appeals saying she was wrong. My attorneys said, I should place my money in their trust fund and I would have to go to them if I wanted something.

---

the $100,000.00 share of the settlement is in dispute, the undersigned will limit its discussion of the settlement figure to that amount.

Tr. at 101. In January 2016, the Probate Court upheld the magistrate's decision, denied Plaintiff's objections, and dismissed the case. Tr. at 56-57. Plaintiff followed the advice of his attorneys and continued to place the settlement funds in his attorneys' client trust account, where he had access to the money on demand, and decided to spend down what he received. ECF Dkt. #16 at 3; ECF Dkt. #1 at 4; Tr. at 101.

In a letter dated November 14, 2016, Plaintiff listed details of his funds from May 1, 2015 up to the time in the letter. Tr. at 100-03. He noted that the settlement funds were deposited directly into his checking account, and, afterwards, he deposited a portion of the installments in his attorney's trust account. *Id.* at 102. For example, the first $25,000 installment from May 2015 was deposited into Plaintiff's checking account, and, shortly thereafter, he purchased a 2008 Mercedes R350 wagon for $11,750 and deposited $9,508 into his trust fund account. *Id.*; *see also id.* at 201-02. He also noted that the withdrawal process consisted of him having to formally request funds from the attorney trust account and then wait until it was mailed to him and cleared by the bank. *Id.* Plaintiff further stated that he made three withdrawals from the attorney trust account. ECF Dkt. #15 at 5; Tr. at 279-80.

On March 7, 2016, a few months after his request to establish a special needs trust was denied, Plaintiff reported the settlement to SSA, specifically noting his $100,000 share. Tr. at 40, 53-54; ECF Dkt. #16 at 3. SSA advised Plaintiff to keep all receipts and proofs of his spending. Tr. at 53-54.

Subsequently, on March 14, 2016, SSA advised Plaintiff that SSI payments would be reduced to $0 beginning April 2016 because Plaintiff had countable resources worth more than $2,000. Tr. at 152; *see* 20 C.F.R. § 416.1205 (resource limit is $2,000). SSA also changed past

amounts that Plaintiff was due for May 2015 through March 2016 because Plaintiff's income increased, which changed his SSI payment for May 2015, and he had countable resources worth more than $2,000 for June 2015 through March 2016. *Id.*

### C. LIVING EXPENSES

On December 3, 2015, Plaintiff's brother, Russell Piskor, made a statement to SSA certifying that Plaintiff had been living with him in his home that he owns as of April 1, 2015. Tr. at 42. Russell also stated that: the monthly mortgage payment was $352.00; the light bill was $110 per month; the gas bill was $140 per month; the water bill was $114 per month; the sewer bill was $100 per month; Plaintiff was responsible for purchasing his own food; and Plaintiff contributed $300 per month for household expenses. *Id.*; *see also* tr. at 26.

Plaintiff himself also provided the same information to SSA that his brother, Russell, provided. Tr. at 25-26. The redetermination summary noted that Plaintiff started living with Russell since April 2, 2015 and he bought food separately. *Id.* He also stated that he paid an average of $300.00 per month toward household expenses, namely for shelter. *Id.* at 26. At the hearing before the ALJ, Plaintiff testified that he paid the cable/internet/phone bill. *Id.* at 280-81. He further stated that the food or shelter he received is worth less than $264.33 (per month). *Id.* at 26.

On December 15, 2015, SSA valued the food or shelter he received at $108.00 for May 2015 on. ECF Dkt. #16-1 at 2. On January 13, 2016, SSA determined that it overpaid Plaintiff $588.61 during certain months between April 2013 through December 2015 due to wages and the cost of food or shelter. ECF Dkt. #16-2. Specifically with regard to food or shelter, SSA corrected its records to include the $108 food or shelter amount for May 2015 through October 2015. *Id.* at 8.

Plaintiff's merits brief only presents arguments regarding the settlement and royalties with

no mention of the benefits received by living with his brother. ECF Dkt. # 15. Since Plaintiff did not contest the SSA's determination regarding expenses saved by living with his brother, the undersigned recommends that the Court finds this issue waived. ECF Dkt. #15; *see e.g.*, *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.") (internal citations omitted); *Brindley v. McCullen*, 61 F.3d 507, 509 (6th Cir.1995) (observing that "[w]e consider issues not fully developed and argued to be waived."); *see also James v. Comm'r of Soc. Sec.*, No. 5:10-CV-02448, 2011 WL 5971032, at *8 (N.D. Ohio Nov. 29, 2011) (finding a particular social security disability issue waived because plaintiff did not offer specific allegations or argumentation of error) (citing *McPherson v. Kelsey*, 125 F.3d 989 (6th Cir.1997)). Additionally, Defendant only addresses this issue as part of the facts of the case, and Plaintiff's response brief still does not allege that the SSA's determination was incorrect. *See* ECF Dkt. #16 at 3-4; ECF Dkt. #17.

**II**. **RELEVANT PORTIONS OF THE ALJ'S DECISION**

On May 2, 2017, the ALJ issued a decision finding that Plaintiff had been overpaid SSI within the meaning of the Social Security Act and is liable for the overpayment. Tr. at 12-18. Specifically, the ALJ found that Plaintiff was overpaid benefits in the amount of $7,859.61 from April 1, 2013 to March 1, 2016. *Id.* at 16. He attributed the overpayment first to the book royalties. *Id.* at 17. Further, the ALJ attributed the overpayment also to the $100,000 litigation settlement. *Id.* He noted that Plaintiff did not have a special needs trust, but rather his attorney held the funds in an account and distributed his payments according to the settlement agreement. *Id.* (citing tr. at 92-99,

192-200, 269-88). The ALJ also considered the Plaintiff's documentation showing how he spent payouts of some of the settlement distributions, which included cars, jewelry, and trips to places, such as Egypt, Dubai, Los Angeles, Las Vegas, and Chicago. *Id.* at 17-18 (citing tr. at 68-75, 100-30, 201-51); *see also* ECF Dkt. #15 at 6-7. The ALJ considered the fact that Plaintiff's account balance fluctuated, but that he nevertheless had settlement funds well over the resource limit. Tr. at 18 (citing tr. at 58-67, 92-99). He also noticed that account details showed deposits into Plaintiff's bank account of the full amounts specified in the settlement agreement, suggesting that he had full discretion over how he spent the funds. *Id.* (citing tr. at 58-75, 100-30). Ultimately, the ALJ found that Plaintiff is liable for repayment of $7,859.61 from April 1, 2013 to March 1, 2016. *Id.*

### III. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of benefits. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937 (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir.

2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole*, 661 F.3d at 937 (citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009)) (citations omitted). Therefore, even if an ALJ's decision is supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

**IV.** **LAW AND ANALYSIS**

    **A.** **SSI OVERPAYMENT**

Plaintiff asserts that he was not overpaid SSI benefits because (1) the royalties from his book should be treated as unearned income and (2) the settlement award should not have disqualified him from SSI because he spent down his money. ECF Dkt. #15. For the following reasons, the undersigned recommends that the Court find that Plaintiff was overpaid and affirm the ALJ's decision.

A disabled individual, with no eligible spouse, is eligible for SSI benefits if his nonexcludable resources do not exceed $2,000 for a given month. 20 C.F.R. §§ 416.1205, 416.1207(a). "Resources" are defined as "cash or other liquid assets or any real or personal property

that an individual (or spouse, if any) owns and could convert to cash to be used for his or her support and maintenance." 20 C.F.R. § 416.1201(a). The amount of income is a "major factor" in deciding whether an individual is eligible for SSI, and, generally, the more income one has the less the benefit will be. 20 C.F.R. § 416.1100. Different rules apply for earned versus unearned income for SSI purposes. 20 C.F.R. § 416.1104.

Social Security regulations state that "[r]oyalties that are earned income are payments to an individual in connection with *any publication of the work of the individual*." 20 C.F.R. § 416.1110(e) (emphasis added); Program Operations Manual System ("POMS") SI 00820.450(B)(1), *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0500820450; POMS SI 00830.510(3), *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0500830510 ("Effective with SSI eligibility and benefit determinations for December 1991 or later, royalties earned by an individual in connection with any publication of his/her work are earned income.") (cited in Plaintiff's submitted evidence, ECF Dkt. #15-1 at 43-44). The regulations also do not permit deductions of any expenses of obtaining income from royalties that are earned income. POMS SI 00820.450(C)(2); *see also* 20 C.F.R. § 416.1111(e) (describing how and when royalties are counted as earned income).

There is no dispute that Plaintiff published a book entitled, *Gypsy Violins: Hungarian Slovak Gypsies in America*, for which he received royalty payments. *See* ECF Dkt. #15 at 1-2; ECF Dkt. #16 at 1. Plaintiff focuses on the fact that he self-published the book and he was not part of a business or trade. ECF Dkt. #15 at 2. However, the regulations plainly include royalty payments connected with *any* publication as earned income, regardless if the purpose of the publication was to document one's genealogy. 20 C.F.R. § 416.1110(e). Therefore, the undersigned recommends that the Court find that the ALJ did not err in finding that the overpayment attributable to royalty

payments was correct because it was earned income. *See* tr. at 17.

With regard to Plaintiff's next contention, the parties stipulate to the fact that Plaintiff received his settlement award of $100,000 in installments and subject to the settlement agreement. ECF Dkt. #15 at -3, 5-8; ECF Dkt. #16 at 2-3; Tr. at 100. Plaintiff raises an issue with the ALJ's statement that "the claimant's attorney holds the funds in an account and distributes his payments according to the settlement agreement." ECF Dkt. #15 at 2 (citing tr. at 17). Plaintiff says this is false and contends that the "payments were clearly outlined in the settlement agreement as liquidating assets" and "each payment came with strict instructions." *Id.* at 2-3; *but see* 20 C.F.R. § 416.1201(b) (defining "liquid resources" to include cash and financial institution accounts). Upon closer examination of the settlement agreement, it states that, subject to a confidentiality provision, Plaintiff was to receive several installments from the $1,000,000 settlement fund that were allocated to specifically Plaintiff (totaling $100,000). *See* tr. at 58-67. There is also a liquidated damages clause in case of a breach by Plaintiff. *Id.* at 66-67.

The record reveals cash deposits from "Branch 0006 Ohio" into Plaintiff's checking account, which he stipulates occurred. *Id.* at 69, 71, 100, 114, 119, 121, 201, 209, 211; ECF Dkt. #15 at 7. The record also reveals that "Branch 0006 Ohio" deposited the settlement funds and is the same account from which Plaintiff withdrew funds. *See. e.g.*, tr. at 209 (Handwritten notes say on November 30, 2015, Plaintiff received a $10,000 deposit, marked "2nd check," and on December 1, 2015, Plaintiff made an $8,000 withdrawal from the same account, marked "deposit [into] trust."). Likely, "Branch 0006 Ohio" is the attorney trust fund. *Cf.* ECF Dkt. #15-1 at 60 (attorney trust account number not provided, but appears to be with Fifth Third Bank). The record is somewhat lacking, but the evidence appears to show that the cash installments were, in fact, deposited into

Plaintiff's checking account from the attorney trust account, and then Plaintiff subsequently allocated a portion of each installment back into the attorney trust account. Accordingly, the undersigned recommends that the Court find no error with the ALJ's conclusion that Plaintiff's attorney held the settlement funds and distributed them according to the settlement agreement. *See* tr. at 17. Any error here would be harmless as it is a factual, not legal, finding, and it has no bearing on the fact that Plaintiff's account reflected large deposits and withdrawals due to the settlement installments, and the parties stipulated that these deposits and withdrawals occurred. *See* ECF Dkt. #15 at 5-8; ECF Dkt. #16 at 3.

Plaintiff also alleges that SSA based its decision to cut off his benefits on faulty information. Specifically, he notes that SSA documents with the heading, "How we figured your ineligibility for benefits," relied on $100,000.00 cash and $1,000 in a Citizens Bank National Association checking account. ECF Dkt. #15 at 3; *see, e.g.*, tr. at 162, 172. Plaintiff states he has never had a Citizens Bank account and never had $100,000 cash in a bank at one time. ECF Dkt. #15 at 3; ECF Dkt. #17 at 3. The record does in fact fail to shed any light on several relevant aspects, including what the Citizens Bank account was and who controlled it. Defendant also failed to address this argument at all in its brief and failed to provide evidence or an explanation as to why the SSA alluded to a Citizens Bank account. Plaintiff's personal checking account seems to be exclusively with KeyBank, and the attorney trust account appears to be with Fifth Third Bank. *See* ECF Dkt. #15-1 at 60-98. Although it is concerning why SSA referred to Citizens Bank and why Defendant failed to address this issue, the fact remains that Plaintiff did, in fact, receive several cash installments totaling $100,000 over which he retained control.

Plaintiff's main contention with regard to the settlement award is that he spent down the money below the $2,000 resource limit and that, therefore, he remained eligible for SSI. ECF Dkt. #15 at 5-8. Plaintiff points to his bank records that indicate his account met the spend down requirements, and he describes his purchases. *Id.* Much of the evidence Plaintiff cites post-date March 1, 2016, which the ALJ found was the end the period he was overpaid benefits. *Id.* at 6 (citing some evidence from June 2016 onward); *see* tr. at 16. Evidence after March 1, 2016 is not relevant to the ALJ's decision, which addressed the issue of whether Plaintiff was overpaid benefits during the period from April 1, 2013 to March 1, 2016. Tr. at 16.

Plaintiff also assumes that as long as his checking account contained less than $2,000 by the end of the month, he would remain eligible for SSI despite his attorney trust account. ECF Dkt. #15 at 5-6. SSA's Program Operations Manual System addresses how trusts function in the context of SSI:

> A trust is a legal arrangement involving property and ownership interests. Property held in trust may or may not be considered a resource for SSI purposes. The general rules concerning resources apply when evaluating the resource status of property held in trust.

POMS SI 01120.200(A), *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0501120200.

Generally, the policy of trusts is treated as follows:

> Trust principal is a resource for SSI purposes if a trust beneficiary (applicant, recipient, or deemor) has legal authority to revoke or terminate the trust and then use the funds to meet his or her food or shelter needs. The trust principal is also a resource for SSI purposes if the trust beneficiary can direct the use of the trust principal for his or her support and maintenance under the terms of the trust.

POMS SI 01120.200(D)(1)(a), *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0501120200.

However, certain exceptions exist to the general rule of counting trusts as income and resources for SSI, namely special needs trusts and pooled trusts. POMS SI 01120.203, *available at*

https://secure.ssa.gov/apps10/poms.nsf/lnx/0501120203.

Plaintiff sought to get a special needs trust, but ultimately was unsuccessful in doing so. ECF Dkt. #15 at 5; Tr. at 56. Instead, Plaintiff and his attorneys established an attorney trust account for the settlement funds. Plaintiff retained control over the trust because he was able to withdraw funds from it on demand. There is no evidence that Plaintiff was limited in his authority to deposit or withdraw funds from the trust. Such a trust does not qualify as an exception to the general rule that trusts are considered income and resources for SSI purposes.

Accordingly, the undersigned recommends that the Court find that the ALJ was correct in finding that Plaintiff was overpaid SSI benefits during the relevant period due to excess resources.

### B. LIABILITY FOR OVERPAYMENT

Defendant correctly notes that Plaintiff did not challenge the SSA's calculation of the overpayment. ECF Dkt. #16 at 10; *see* ECF Dkt. #15. Plaintiff's argument was simply that SSA did not overpay him due to the reasons discussed above. Plaintiff also requested his SSI checks to be restarted from January 1, 2018 too date. ECF Dkt. #15 at 8.

The Social Security Act provides that "[w]henever the Commissioner of Social Security finds that more or less than the correct amount of payment has been made under this subchapter, proper adjustment or recovery shall be made, under regulations prescribed by the Commissioner of Social Security." 42 U.S.C. § 404(a)(1). An exception for the repayment of overpayments exists, which provides in pertinent part that:

> In any case in which more than the correct amount of payment has been made, there shall be no adjustment of payments to, or recovery by the United States from, any person who is without fault if such adjustment or recovery would defeat the purpose of this subchapter or would be against equity and good conscience.

42 U.S.C. § 404(b)(1); *see also Valley v. Comm'r of Soc. Sec.*, 427 F.3d 388, 391 (6th Cir. 2005)

("[t]he Social Security Act mandates repayment of overpayments except where an individual 'is without fault' and 'such adjustment or recovery would defeat the purpose of [Title II of the Social Security Act] or would be against equity and good conscience'") (quoting 42 U.S.C. § 404(b)).

In cases involving the recovery of overpayments, the threshold issue is "fault," and the plaintiff has the burden of establishing the "negative prerequisite" of being "without fault" before the overpayment can be waived. *Watson v. Sullivan*, 940 F.2d 168, 171 (6th Cir.1991) (internal citation omitted). In the instant case, Plaintiff did not request SSA to waive recovery of his overpayment. ECF Dkt. #16 at 10; *see also* ECF Dkt. #16-2 at 2 (notifying Plaintiff about waiver). Consequently, SSA never determined whether Plaintiff bore any fault in incurring the overpayment, and financial hardship is not at issue in this case. *Id.*

Accordingly, the undersigned recommends that the Court find Plaintiff liable for the overpayments in the amount of $7,859.61. The undersigned also recommends that the Court not grant Plaintiff's requested relief to restart SSI payments from January 1, 2018 because it is outside the scope of review, which is limited to the final decision of the Commissioner of Social Security. *See* 42 U.S.C. § 405(g); *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

**V.      CONCLUSION AND RECOMMENDATION**

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the decision of the ALJ and DISMISS the instant case in its entirety with prejudice.

Date: September 6, 2019                             */s/George J. Limbert*
                                                    GEORGE J. LIMBERT
                                                    U.S. MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).